Erin Rose Ronstadt, SBN 028362
Kristin N. Cox, SBN 030240
OBER & PEKAS, PLLC
1940 E. Camelback Road, Suite 150
Phone: (602) 277-1745
Fax: (602) 761-4443
erin@oberpekas.com
kristin@oberpekas.com

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Mark McGlasson, a married man, | **Case No.** |
| Plaintiff, | |
| v. | **COMPLAINT** |
| Long Term Disability Coverage for All Active Full-time and Part-time Employees, other than those classified by the Employer as Pilots, who are U.S. residents and whose Total Annual Cash Compensation is between $60,000 and $199,999, excluding temporary and seasonal Employees, an ERISA benefit plan; The Prudential Insurance Company of America, a plan fiduciary; and JPMorgan Chase Bank, N.A., a plan administrator, | |
| Defendants. | |

For his claims against Defendants Long Term Disability Coverage for All Active Full-time and Part-time Employees, other than those classified by the Employer as Pilots, who are U.S. residents and whose Total Annual Cash Compensation is between $60,000 and $199,999, excluding temporary and seasonal Employees (the "Plan"), The Prudential Insurance Company of America ("Prudential"), and JPMorgan Chase Bank, N.A. ("JPMorgan") (collectively "Defendants"), Plaintiff Mark McGlasson ("Mr. McGlasson" or "Plaintiff") alleges as follows:

1

**JURISDICTION, VENUE AND PARTIES**

2

1.    This action arises under the Employee Retirement Income Security Act of

3

1974, 29 U.S.C. §§ 1001 et seq. ("ERISA").

4

2.    The Plan is a purported ERISA benefit plan established and maintained by

5

JPMorgan for the benefit of its employees. The Plan is a welfare benefit plan that offers

6

short-term disability ("STD") benefits and group long-term disability ("LTD") benefits.

7

3.    JPMorgan is the Plan Administrator, Plan Sponsor, and Employer.

8

4.    At all relevant times, Prudential administered claims for JPMorgan under

9

the Plan, acted on behalf of the Plan, and acted as an agent for JPMorgan.

10

5.    Prudential fully insures LTD benefits under the Plan with a Policy, Group

11

Contract Number G-50684-DE.

12

6.    At all relevant times, Mr. McGlasson was a participant and beneficiary of

13

the Plan as an employee of JPMorgan.

14

7.    Mr. McGlasson is a married person. He currently resides in Maricopa

15

County, Arizona and has been a resident of Maricopa County at all relevant times.

16

8.    The Plan and JPMorgan, a large corporation, have their principal place of

17

business in the state of Delaware. Prudential has its principal place of business in the

18

state of New Jersey. Defendants Prudential and JP Morgan are licensed and authorized to

19

do business in Maricopa County, Arizona, and reside and are found within Maricopa

20

County within the meaning of the jurisdiction and venue provisions of ERISA, 29 U.S.C.

21

§ 1132 and 28 U.S.C. § 1391.

22

9.    This Court has jurisdiction over the subject matter of this action under

23

ERISA, 29 U.S.C. §§ 1132(a), 1132(e)(1), and 28 U.S.C. §§ 2201-02 (declaratory

24

judgments).

25

10.    Venue is proper in this Court under ERISA, 29 § 1132(e)(1) and 28 U.S.C.

26

§ 1391(b).

27

11.    JPMorgan has a duty to administer the plan prudently and in the best

28

interest of all Plan members and beneficiaries. Prudential acted as its agent to make final

OBER & PEKAS, P.L.L.C.
1940 E. Camelback Road, Ste. 150
Phoenix, AZ  85016
(602) 277-1745

decisions regarding the payment of disability benefits for the Plan and to administer the Plan. Accordingly, Mr. McGlasson is informed and believes that JPMorgan and Prudential are either a "named fiduciary" of the Plan, pursuant to 29 USC § 1133(2); and/or a "deemed fiduciary" pursuant to 29 USC § 1002 (21)(A); and/or a "designated fiduciary," pursuant to 29 USC § 1105(c)(1)(B).

12.    Prudential had actual or apparent authority to act as a fiduciary on behalf of the Plan.

13.    Prudential's third-party vendors had actual or apparent authority to act as fiduciaries on behalf of the Plan and administered the Plan in providing services to Defendants.

14.    On information and belief, JPMorgan conferred Prudential with discretionary authority to interpret the Plan and to make eligibility determinations regarding the Plan.

15.    Prudential acted under a structural conflict of interest in both administering and paying out on claims under the Plan.

16.    Mr. McGlasson is entitled to *de novo* review of his claims, because given Prudential's structural conflict of interest and its "wholesale and flagrant violations of the procedural requirements of ERISA," *de novo* review is warranted. Prudential should not be entitled to any deference in its decision-making in light of the facts and circumstances of this claim.

## GENERAL ALLEGATIONS

17.    All previous and subsequent paragraphs are incorporated by reference.

### *Mr. McGlasson's Employment*

18.    In September 2006, JPMorgan employed Mr. McGlasson, where he was promoted to a Proactive Territory Manager position.

19.    As a Proactive Territory Manager, Mr. McGlasson assisted in the development and improvement of JPMorgan's merchant companies' banks, specifically

OBER & PEKAS, P.L.L.C.
1940 E. Camelback Road, Ste. 150
Phoenix, AZ 85016
(602) 277-1745

for a region in California. Mr. McGlasson was responsible for managing sales teams, including hiring and firing personnel. From a sales perspective, he helped the company meet sales goals, as well as sell additional products outside of the main processing products. From a leadership perspective, he helped his team meet their respective sales goals, trained new team members, and completed employee performance reviews. Mr. McGlasson's team worked primarily on the phone, and he worked in the office with them.

20.     Mr. McGlasson worked as a Proactive Territory Manager for JPMorgan until leaving work on August 29, 2011 due to his disability. JPMorgan employed Mr. McGlasson for approximately eight years until notifying him in December 2014 that his employment was being terminated; Mr. McGlasson was still appealing Prudential's denial of LTD benefits when JPMorgan terminated his employment.

### Mr. McGlasson's Disability Benefits under the Plan

21.     To be eligible for LTD benefits, during the first 24 months, Mr. McGlasson must be "unable to perform the material and substantial duties of [his] regular occupation due to [his] sickness or injury; and [be] under the regular care of a doctor; and have a 20% or more loss in [his] monthly earnings due to that sickness or injury." "Material and substantial duties" are defined as those "normally required for the performance of [Mr. McGlasson's] regular occupation; and cannot be reasonably omitted or modified." A "Proactive Territory Manager" is considered to be his regular occupation under the Plan.

22.     To be eligible for LTD benefits after 24 months, Mr. McGlasson must be "unable to perform the duties of any gainful occupation for which [he is] reasonably fitted by education, training or experience; and [he is] under the regular care of a doctor" due to the same sickness or injury. "Gainful occupation" is "an occupation, including self employment, that is or can be expected to provide [Mr. McGlasson] with an income

OBER & PEKAS, P.L.L.C.
1940 E. Camelback Road, Ste. 150
Phoenix, AZ 85016
(602) 277-1745

within 12 months or [his] return to work, that exceeds . . . 60% of [his] monthly earnings, if [he is] not working."

23.     Under the Plan, Mr. McGlasson could be entitled to LTD benefits until sixty-five (65) years of age.

24.     Mr. McGlasson is entitled to receive 60% of his pre-disability earnings, which was $12,271.50 a month; therefore, he is entitled to $7,362.90 each month in LTD benefits before any applicable offsets.

25.     Mr. McGlasson is required to participate in a first appeal. Thereafter, he may participate in a second, voluntary appeal.

### *Mr. McGlasson's Receipt of STD and LTD Benefits*

26.     Mr. McGlasson suffers from multiple medical conditions that render him disabled under the Plan. Mr. McGlasson applied and was approved for STD benefits in December 2, 2009 following back surgery. He returned to work until undergoing a neck surgery on April 13, 2011; this surgery would prove to be the first of several surgeries that Mr. McGlasson would need. He applied and was approved for STD benefits surrounding his April 13, 2011 surgery. Mr. McGlasson returned to work for a short period of time after his April 13, 2011 surgery; however, he struggled significantly. As a result, he stopped working completely on August 29, 2011 due to his conditions.

27.     After receipt of STD benefits, Mr. McGlasson applied and was approved for LTD benefits effective February 27, 2012. Prudential approved his LTD claim based on a review of the medical records but began recommending "flight path 4," or "Segment 4," in terms of Prudential's management of the claim.

28.     Despite various treatments, Mr. McGlasson's debilitating symptoms continued, and his treating providers, including his orthopedic surgeon, reported that Mr. McGlasson could not work.  As of March 2012, Mr. McGlasson's objective medical findings supported his reported symptoms and the need for further surgery. The April 13,

OBER & PEKAS, P.L.L.C.
1940 E. Camelback Road, Ste. 150
Phoenix, AZ 85016
(602) 277-1745

2011 neck surgery had failed; among the issues, hardware was coming loose in Mr.
McGlasson's neck, the bone had not fused, and his spine was being forced outwards.

29.     Mr. McGlasson underwent another neck surgery on March 13, 2012. This
neck surgery would also prove ultimately unsuccessful. Moreover, his symptoms did not
improve following the March 13, 2012 surgery.

30.     On June 30, 2012 Mr. McGlasson participated in a Social Security
Administration ("SSA") consultative examination ("CE") with Dr. Melissa Linner for
consideration of a Social Security Disability Insurance ("SSDI") application.

31.     Prudential requested that Research Consultants Group, Inc. ("RCG")
conduct an "Activity Investigation" dated August 27, 2012, as well as surveillance on
September 19, 20, and 21, 2012 pursuant to "flight path 4."  The surveillance and
activity checks involved asking Mr. McGlasson's unidentified neighbors personal
questions about him and his family, which RCG referred to as "neighborhood
canvassing." Although neither the particular questions nor neighbors were ever revealed,
RCG seemingly asked neighbors about Mr. McGlasson's marital and familial history,
medical history, activities, and restrictions and limitations.

32.     During the September 19-21, 2012 surveillance, Prudential recorded a total
of 3 minutes and 12 seconds of video. On September 19, 2012, Prudential did not
observe Mr. McGlasson leave the house but did confirm through "discreet inquiry" that
he was home. On September 20, 2012, Prudential contacted Mr. McGlasson's medical
provider to confirm a doctor's appointment and followed him as he traveled to the
appointment. He used a cane some of the time and, when he did not, was observed
limping. On September 21, 2012, Prudential again utilized a "discreet inquiry" to
confirm Mr. McGlasson was home but obtained no footage.

33.     Throughout 2012, Mr. McGlasson tried conservative treatments, including
a bone stimulator, to delay the need for additional surgery. He experienced severe pain.
Due to another failed surgery and his pain, on March 26, 2013, Mr. McGlasson

OBER & PEKAS, P.L.L.C.
1940 E. Camelback Road, Ste. 150
Phoenix, AZ 85016
(602) 277-1745

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

underwent his third neck surgery in just under two years. He continued to provide Prudential with information it requested and believed his LTD benefits would continue to be paid based on his eligibility under the Plan.

34.      Following his third surgery, Mr. McGlasson continued experiencing neck pain and other symptoms. Diagnostic imaging and evaluation in May 2013 substantiated additional spine and neck degeneration, including loosening of hardware. Mr. McGlasson was facing the possibility of a fourth surgery.

35.      Meanwhile, Prudential continued to note the claim as "Segment 4" and again employed RCG to conduct another "Activity Investigation" summarized in a report dated July 11, 2013, which included subsequent surveillance of Mr. McGlasson on August 5, 6, and 7, 2013. The surveillance was even less eventful this attempt; Prudential only recorded approximately 20 seconds of Mr. McGlasson in his backyard on one day, August 5, from the nose up. Again, RCG engaged in "neighborhood canvassing" for Prudential. Based on RCG's solicited comments from unidentified neighbors as part of its second "neighborhood canvass," Mr. McGlasson purportedly attended LA Fitness 2-3 times each week, walked his dog around the neighborhood with his wife, and hiked a few times each month. He also went out to eat at local restaurants. None of the neighbors' identities were identified, and Prudential did not further verify that the neighbors had any personal knowledge of Mr. McGlasson and his family's activities.

36.      Prudential also requested a file review from Dr. Claude Oster, specialist in Physical Medicine and Rehabilitation, with Nationwide I.M.E., who conducted a "Medical Record File Review" of Mr. McGlasson's file that is summarized in a report dated August 25, 2013. The file review is littered with blatant misstatements and inaccuracies. Despite Mr. McGlasson's multiple surgeries, conditions, and resulting symptoms, Dr. Oster concluded that there should be *no* restrictions and limitations on Mr. McGlasson's functionality. Dr. Oster did not reach out to Mr. McGlasson's treating

1

2
physicians for information or clarification on his conditions and treatment. He did not

3
explain why he disagreed with Mr. McGlasson's treating physicians, and he did not

personally examine Mr. McGlasson.

4
### Mr. McGlasson's Receipt of SSDI Benefits

5
37.     Mr. McGlasson attended an in-person SSA hearing with Administrative

6
Law Judge Sheldon Zisook, who awarded Mr. McGlasson SSDI benefits in a Fully

7
Favorable Decision dated September 6, 2013. Significantly, in his decision, Judge

8
Zisook expressly rejected Dr. Linner's CE findings. First, Judge Zisook found that Dr.

9
Linner's CE "did not adequately consider [Mr. McGlasson's] subjective complaints or

10
the combined effect of [his] impairments." Ironically, Prudential focused much of its

11
Denial on the CE with Dr. Linner, specifically because of her observations regarding Mr.

12
McGlasson's credibility. Second, Judge Zisook found that "[c]onsultative examiner Dr.

13
Melissa Linner reported that [Mr. McGlasson] can perform a reduced range of light work

14
. . . [I am] unable to assign any significant weight to this opinion in light of the overall

15
medical evidence, which indicates that [Mr. McGlasson] would have greater

16
restrictions." Judge Zisook assigned "great weight" to treating provider who stated that

17
Mr. McGlasson could not work, because the treating provider's assessment was

18
"supported by the objective medical evidence."

19
### Prudential's First Denial of Benefits and "Recovery" Efforts

20
38.     Prudential denied Mr. McGlasson's LTD benefits in a letter dated

21
September 19, 2013 (the "First Denial"). According to Prudential, a review of the file

22
did not support *any* medically necessary restrictions and or limitations from any one

23
condition or combination of conditions from May 2013 forward.  Prudential based the

24
First Denial on Dr. Oster's file review, Dr. Linner's CE, and RCG's "neighborhood

25
canvassing" efforts, including the allegation that Mr. McGlasson went to LA Fitness

26
several times per week.

27

28

**OBER & PEKAS, P.L.L.C.**
1940 E. Camelback Road, Ste. 150
Phoenix, AZ  85016
(602) 277-1745

-8-

OBER & PEKAS, P.L.L.C.
1940 E. Camelback Road, Ste. 150
Phoenix, AZ 85016
(602) 277-1745

39.     Prudential knew about Mr. McGlasson's SSDI award prior to issuing the First Denial. Allsup, Prudential's preferred third party vendor, represented Mr. McGlasson throughout the SSDI application and at the SSA hearing with Judge Zisook. Prudential and Allsup were in frequent communication about the SSA application process, and Allsup sought overpayment on behalf of Prudential.

40.     Instead of considering the SSDI award in determining eligibility, Prudential terminated Mr. McGlasson's LTD benefits and then immediately demanded overpayment in the amount of $28,006.60. It used Mr. McGlasson's SSA representative, Allsup, to spearhead the collection efforts against Mr. McGlasson.

41.     In a letter dated September 30, 2013, Mr. McGlasson's legal counsel notified Prudential that all communications should be directed to the law firm. It also requested all relevant documents under ERISA and detailed the requested information in the letter. Delivery to Prudential was confirmed via Certified Mail receipt.

42.     In disclosures with a cover letter dated October 2, 2013, Prudential disclosed the claim file. Prudential did not address Plaintiff's enumerated requests and provided a blanketed denial for requested further documentation, citing that it was producing all relevant documents required under ERISA.

43.     In a letter dated October 31, 2013, Mr. McGlasson's legal counsel wrote to Prudential regarding its overpayment demands immediately following the First Denial: "After careful review of the Prudential Reimbursement Agreement form, the Plan, and applicable law, we have advised Mr. McGlasson about the potential consequences of keeping his SSDI award. Out or necessity, Mr. McGlasson has decided to use the SSDI award to pay for living expenses in order to avoid bankruptcy. Because of Prudential's termination, he feels that he has no choice but to use the retroactive SSDl award in this manner. Prudential's LTD benefits termination has placed Mr. McGlasson and his family on the verge of financial ruin . . ." Plaintiff's legal counsel confirmed Prudential's

OBER & PEKAS, P.L.L.C.
1940 E. Camelback Road, Ste. 150
Phoenix, AZ 85016
(602) 277-1745

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

receipt of this letter. Mr. McGlasson also terminated his relationship with Allsup, who was acting as Prudential's collections agent.

44.     Even after the October 31, 2013 letter from counsel, Prudential and Allsup continued communicating with Mr. McGlasson directly and threatening collections if he did not provide the overpayment amount. Their efforts are documented in a letter sent directly to Mr. McGlasson dated November 25, 2013 (three days before Thanksgiving), threatening further action if he did not personally hand over the SSDI benefits to Prudential: "Please be advised that Prudential stands firm on its position that the overpayment is owed by you and stands willing to take appropriate action in order to protect its interest if you do not resolve this matter by voluntary reimbursement. If we do not receive reimbursement by December 16, 2013, further action will be taken." Prudential made these threats, despite its fiduciary role in the LTD appeals process and despite the fact that the Plan provided for alternative means for collecting "overpayment."

45.     Plaintiff's legal counsel spoke with Prudential directly and again sent a letter dated November 26, 2013, detailing the legal issues with Prudential and Allsup's overpayment efforts. The letter discussed Ninth Circuit precedent that prohibited the recovery of SSDI benefits that were not Plan benefits, as well as explained that sending Plaintiff to collections was not equitable relief permitted under ERISA. The letter also highlighted serious concerns over Prudential's dual role as fiduciary and collections agent: "Prudential is both funding and administering Mr. McGlasson's LTD benefits claim while also actively seeking overpayment from him. Prudential's financial interests appear to be governing its actions on this claim. Please provide evidence of how you are safeguarding Mr. McGlasson's LTD claim from Prudential's obvious conflict of interest. We previously requested this information from Prudential in our September 30, 2013 claim file request letter. Prudential did not disclose anything pertaining to this issue, so

OBER & PEKAS, P.L.L.C.
1940 E. Camelback Road, Ste. 150
Phoenix, AZ 85016
(602) 277-1745

we must assume that Prudential has not taken any safeguards whatsoever. Please let me know if I am incorrect."

46.     In a letter dated January 29, 2014, Prudential agreed to cease collection efforts pending resolution of the LTD appeal. Meanwhile, Mr. McGlasson and his family slid further into financial ruin and became bankrupt, which would not have happened if Prudential had not terminated Mr. McGlasson's LTD benefits.

47.     On February 7, 2014, Mr. McGlasson requested several relevant documents that were not included in Prudential's October 2, 2013 disclosures, including but not limited to the surveillance videos; identification of the "neighbors" that RCG spoke with and any documentation of those conversations; and service contracts between Prudential and its vendors Allsup, RCG, Nationwide I.ME., given that these vendors were entrusted with fiduciary roles in the handling of Mr. McGlasson's claim.

48.     On February 28, 2014, Plaintiff's legal counsel invited Prudential to attend a personal interview of Mr. McGlasson and expressed concern that, to date, Prudential had not disclosed the surveillance videos. Prudential declined to attend and eventually provided over 200 pages of additional, relevant disclosures along with a letter dated March 5, 2014 and finally, the surveillance tapes. It still withheld requested documents on the basis that any further disclosure was "premature." Appeals Specialist Kimberly Cyr explained that the complete appeal *must* be received no later than April 7, 2014.

### *Mr. McGlasson's First Appeal and the IME Request*

49.     Mr. McGlasson timely appealed the First Denial in a letter dated April 7, 2014 (the "First Appeal"). In the 18-page First Appeal, Mr. McGlasson provided additional medical evidence and a detailed discussion of his medical conditions and why they are disabling. He provided new imaging that substantiated the need for further neck surgery. Among the evidence provided, he also provided proof that he had not been a member of LA Fitness since 2008, and that the alleged neighbors' statements were inaccurate.

OBER & PEKAS, P.L.L.C.
1940 E. Camelback Road, Ste. 150
Phoenix, AZ 85016
(602) 277-1745

50.     In a letter dated April 24, 2014, Prudential requested Mr. McGlasson provide medical records that were previously disclosed with the First Appeal and also requested an independent medical examination ("IME") of Mr. McGlasson to determine restrictions and limitations ("R&Ls") from September 19, 2013. Both in a discussion and in a letter dated April 30, 2014, Plaintiff's legal counsel explained for various reasons why an IME was unreasonable at this stage in the process, questioned how a current IME would be able to assess past R&Ls, and argued that Prudential should reinstate LTD benefits and thereafter conduct an IME. Notwithstanding, legal counsel agreed to comply if Prudential would agree to certain conditions. Legal counsel also inquired about Flight Path 4.

51.     In response to Plaintiff's IME request that Prudential and Plaintiff choose a mutually agreeable IME doctor with a non-litigation background, Prudential responded as follows in a letter dated May 9, 2014:

> The doctor is chosen by medical vendors in order to eliminate any influence by Prudential and keep the examination truly "independent." We are confident that our vendors have fully reviewed and evaluated the physicians to whom the IME referrals are submitted, and that the IME physicians are board certified in their specialty field. As such, Prudential has no influence as to the selection of the IME physician other than the requested clinical specialty. We assert that the physician to whom the IME is assigned will be selected by the external vendor only, without influence from your office or from Prudential.

Prudential agreed to allow Mr. McGlasson to videotape the IME. Prudential lastly explained, "[a]s stated above, we will move forward with the scheduling of the IME and if you so chose, you may refuse to allow Mr. McGlasson to participate." Prudential did not ask for a response from Plaintiff's legal counsel and indicated the IME would be

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**OBER & PEKAS, P.L.L.C.**
1940 E. Camelback Road, Ste. 150
Phoenix, AZ 85016
(602) 277-1745

scheduled and Plaintiff notified with the option to attend. Mr. McGlasson waited to be notified.

52.     One day before its 45-day deadline to make a determination on appeal, Prudential sent a letter dated May 21, 2014, explaining it would suspend all ERISA timeframes pending the IME, and that it was unable to make a determination on the claim until legal counsel responded to the May 9, 2014 letter. However, the May 9, 2014 letter did not ask for a response and indicated Prudential would contact Plaintiff with IME details.

53.     In a letter dated May 27, 2014, Mr. McGlasson's legal counsel explained that Prudential failed to comply with its 45-day deadline, that requesting an IME on appeal does not indefinitely toll Prudential's review requirements under ERISA, and that Prudential's refusal to allow Mr. McGlasson to respond to the IME on appeal would be a violation of *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 680 (9th Cir. 2011). Legal counsel also explained the obvious issues regarding the IME doctor's "independent" nature:

> I do not share your confidence in the vendor's IME reviewer selection or the competence of that reviewer, especially in light of the file review you secured [previously]. Moreover, I dispute that the vendor is "truly independent," because we have not been afforded an opportunity to provide input regarding vendor selection, or to ensure that the vendor implements appropriate quality procedures in retaining physicians. Indeed, you have not yet revealed the vendor's identity to Mr. McGlasson, and you have refused him the opportunity to ask questions of the IME reviewer or to respond to the IME report. Prudential's previously employed vendors, such as MLS or RRS, are widely recognized as defense-oriented and biased against claimants. Besides the fact that you have singlehandedly selected the vendor, you are also paying for the vendor. Given the circumstances,

-13-

OBER & PEKAS, P.L.L.C.
1940 E. Camelback Road, Ste. 150
Phoenix, AZ  85016
(602) 277-1745

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Prudential cannot in good faith argue that it has no influence over the IME

process.

Notwithstanding, Plaintiff *still agreed to an IME* if certain questions were answered and conditions were met that would ensure an independent IME process. Mr. McGlasson even offered to pay for half of the IME.

54.     Prudential pressed forward with scheduling an IME with ExamWorks. However, in a letter dated June 5, 2014, Appeals Specialist Susan Schultz alleged that Plaintiff's counsel was in direct communication with the IME physician's office and, in the interest of keeping the IME "independent," a different IME doctor would be requested. The allegation was untrue and insinuated that legal counsel attempted to unduly influence the IME process. Plaintiff's legal counsel submitted an explanatory letter and supporting declaration explaining that the allegation was untrue and expressing her concern over the allegation. Legal counsel set a deadline for completing the IME: "[U]nless Prudential can agree to the scheduling *and completion* of an IME on or by Friday, June 20, 2014 and the completion of its review on or by Friday, July 18, 2014, we are hereby declining participation in the IME, so as to avoid further delay on Mr. McGlasson's claim."

55.     Prudential responded to the June 5, 2014 letter on June 24, 2014 and maintained her accusation that Plaintiff's legal counsel tried to contact the IME physician as reported by his office. She indicated that Prudential was in the process of scheduling another IME.

56.     On July 1, 2014 and July 5, 2014, Plaintiff's legal counsel was contacted by James Papi who held himself out to be a "Senior Appeals Specialist" filling in for Susan Schultz. He expressed Prudential's inability to find an IME doctor in Mr. McGlasson's geographic area, so Prudential wanted to secure another file review instead of an IME; therefore, it wanted Plaintiff's legal counsel to approve a review period beyond 90 days. Plaintiff's legal counsel "approved" Prudential's additional time until

OBER & PEKAS, P.L.L.C.
1940 E. Camelback Road, Ste. 150
Phoenix, AZ  85016
(602) 277-1745

July 18, 2014 but would not approve the time requested by Prudential.  It was soon discovered and documented that Mr. Papi was an active attorney working for Professional Disability Associates ("PDA"), a third party claims provider, and not Prudential. In written correspondence with Plaintiff's legal counsel, Mr. Papi dated a letter earlier than the actual drafting date to make it appear that he had intended to disclose his PDA affiliation; however, the letter was sent and faxed after Mr. McGlasson's legal counsel discovered and revealed Mr. Papi's dishonest conduct.

### Prudential's Second Denial and Overpayment Efforts

57.   Prudential upheld its First Denial in a letter dated August 18, 2014 (the "Second Denial"). Prudential did not meaningfully consider the supplemental medical evidence and avoided any analysis of the claim by simply reciting portions of Plaintiff's medical history. Prudential's conclusion to uphold the First Denial was unreasoned and not at all logically related to its rendition of the medical history. It acknowledged Mr. McGlasson had a second, voluntary appeal but immediately initiated collection efforts again in a letter dated August 20, 2014.

58.   In its Second Denial, Prudential misrepresented the reason it did not pursue the IME as being due to Plaintiff's objections, when in reality, Prudential elected not to move forward under the a reasonable timeframe, because it purportedly could not find an IME doctor in Mr. McGlasson's "geographic" area.

59.   Through MLS, Prudential secured a file review by Dr. Siva Ayyar to support its Second Denial, who conducted a "peer review" of Mr. McGlasson's file summarized in a report dated July 29, 2014 without evaluating Mr. McGlasson in person. Dr. Ayyar established, without persuasive explanation, limitations that were unsupported and contradictory to those set forth by Mr. McGlasson's treating physicians. He also reviewed and relied on the surveillance reports by RCG, which were biased and riddled with false statements from the "neighborhood canvassing."

OBER & PEKAS, P.L.L.C.
1940 E. Camelback Road, Ste. 150
Phoenix, AZ 85016
(602) 277-1745

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

60.     On August 25, 2014, Plaintiff's legal counsel responded to Prudential's renewed overpayment efforts: "Nothing has changed since my November 26, 2013 letter, except that the McGlassons have, in fact, been forced into bankruptcy as a result of Prudential's termination. The recent delay in rendering a decision within 90 days per ERISA regulation has only further exacerbated the McGlassons' financial issues. I do not represent the McGlassons on their bankruptcy matter, but I can inquire as to their attorney's contact information if you would like." Prudential requested the bankruptcy information, so Plaintiff's legal counsel sent the entire Voluntary Petition to Prudential in a letter dated October 10, 2014.

### *Mr. McGlasson's Second, Voluntary Appeal*

61.     On February 13, 2015, Mr. McGlasson filed his second, voluntary appeal permitted under the Plan (the "Second Appeal"). Since the First Appeal, Mr. McGlasson had continued to struggle medically and underwent a fourth surgery on September 23, 2014. In light of the worsening of his conditions and the additional surgery, Mr. McGlasson decided to participate in the voluntary appeal to explain the need for additional surgery. The Second Appeal included additional documentation in support of Mr. McGlasson's disability, including updated imaging, records from the fourth neck surgery on September 23, 2014, evidence about Dr. Ayyar's credibility, and clarification from Mr. McGlasson's orthopedic surgeon that Mr. McGlasson will likely need additional surgical intervention and "is incapable of performing any type of full-time work secondary to his cervical and lumbar degenerative disc disease." Mr. McGlasson's orthopedic surgeon addressed Dr. Ayyar's report and widely disagreed with Dr. Ayyar's opinions.

62.     On March 2, 2015, Prudential sent another letter, just like in its review of the First Appeal, alleging that various medical records were missing. In fact, all of the medical records were in its possession and provided with the Second Appeal. Notwithstanding, it asked for the medical records to be facilitated *after* its 45-day review

OBER & PEKAS, P.L.L.C.
1940 E. Camelback Road, Ste. 150
Phoenix, AZ 85016
(602) 277-1745

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

deadline. In a detailed letter dated March 4, 2015, Mr. McGlasson promptly explained where each and every medical record was in the administrative record submitted with the Second Appeal and asked that Prudential please call legal counsel in the future to locate documents, so that the review period would not be unnecessarily delayed.

63.     After Plaintiff notified Prudential that the first 45 days had lapsed for rendering a determination, and Prudential missed this deadline, it sent a letter conveniently noted with an earlier date to give the appearance that Prudential had complied with ERISA-mandated timeframes; however, it was apparent from the fax and mailing envelope (both are part of the administrative record) that the letter was not sent in compliance with Prudential's 45-day review. This was not the first time that Prudential had dated a letter earlier than the true drafting of that letter in order to paint the company in a more favorable light. These "white lies" are not harmless and demonstrate Prudential's mismanagement of the claim and dishonesty in its claims handling.

### Prudential's Final Denial and Demand for "Overpayment"

64.     Prudential issued its final denial in a letter dated April 27, 2015 (the "Final Denial"). Of its many issues, the Final Denial is highly adversarial, relies on new reasons for denial previously undisclosed, and provides no meaningful explanation as to why Mr. McGlasson does not qualify for LTD benefits under the terms of the Plan. Prudential contradicted its reasons for previous denials by acknowledging that Mr. McGlasson would require recovery time after surgeries and provided new R&Ls based on a new file reviews that Mr. McGlasson never had the opportunity to see.  Although the claim had been ongoing since literally September 2013 when Mr. McGlasson was awarded SSDI benefits, Prudential discredited the SSA decision because it was now outdated in 2015.

65.     Despite physical therapy, injections, various medications, and four cervical spine surgeries occurring on April 13, 2011, March 13, 2012, March 26, 2013, and September 23, 2014, Mr. McGlasson continued to experience ongoing neck, arm, and

low back pain. He also has other medical conditions and symptoms that contribute to his disability under the Plan.

66.     Mr. McGlasson's medical conditions never improved and, in fact, have worsened since May 2013.

67.     Mr. McGlasson is totally disabled from his regular occupation and any gainful occupation for which he is reasonably fitted by training, education, and experience.

68.     Mr. McGlasson continues to be disabled as defined by the Plan for LTD benefits eligibility.

69.     Mr. McGlasson should be entitled to LTD benefits until he is 65 years old.

70.     Mr. McGlasson's claims are subject to *de novo* review.

71.     Mr. McGlasson exhausted his administrative remedies under the Plan.

72.     Mr. McGlasson satisfied all of the jurisdictional prerequisites to filing a claim, and his claim is timely before this Court.

73.     On information and belief, Mr. McGlasson may be entitled to additional benefits from JPMorgan as a disabled employee including, but not limited to, health insurance, life insurance, supplemental LTD benefits, and retirement/pension credits.

74.     Mr. McGlasson is entitled to seek any and all relief allowed pursuant to ERISA, including equitable remedies, in an effort to enforce his rights under the Plan.

**COUNT I**
**(Recovery of Plan Benefits)**
**(Defendants Prudential and the Plan)**

75.     All previous and subsequent paragraphs are incorporated by reference.

76.     The Plan is an Employee Welfare Benefit Plan as defined in ERISA, 29 U.S.C. § 1002.  Defendants are the Plan, Plan administrators, or Plan fiduciaries of the Plan under ERISA.

77.     The Plan represents LTD coverage and a promise to provide LTD benefits until Mr. McGlasson is no longer disabled under the terms of the Plan.

OBER & PEKAS, P.L.L.C.
1940 E. Camelback Road, Ste. 150
Phoenix, AZ 85016
(602) 277-1745

78.     Mr. McGlasson became disabled in 2011 and continues to be disabled. He is unable to perform the material and substantial duties of any gainful occupation under the terms of the Plan.  He has claimed the benefits under the Plan to which he is entitled.

79.     Mr. McGlasson reasonably expected that his conditions met the requirements of Disability as defined by the Plan for LTD benefits, and that he would receive benefits under the Plan until age 65 or until he was no longer disabled.

80.     Despite the coverage of Mr. McGlasson's disability, Prudential has improperly terminated LTD benefits to Mr. McGlasson in breach of the Plan and ERISA.  Prudential's collective conduct was arbitrary, capricious, an abuse of discretion, not supported by substantial evidence, and was clearly erroneous. Prudential committed almost every wrongful action conceivable to justify the Court reducing the level of discretion afforded to Prudential. In light of Prudential's structural conflict of interest and wholesale and flagrant procedural violations of ERISA, Mr. McGlasson should be entitled to *de novo* review.

81.     Prudential's structural conflict of interest manifests in the form of "flight paths;" instead of evaluating a participant's eligibility based on the applicable plan language and medical evidence, Plaintiff is informed and believes that Prudential makes claims decisions based on the claims resources and financial risk it faces on certain claims.  Mr. McGlasson was identified early on in Prudential's claims process as "flight path 4" by several Prudential employees, notably Erin Benjamin, Katherine Harrison, Aneesah Fain, and Donna Racioppi. **One month before the First Denial, Mr. McGlasson's claim file reflects that the "[b]asis for flight path recommendation: no [return to work] plans, multi[ple] conditions."** As a result of his "flight path 4" designation, Mr. McGlasson was referred to "senior claims review." Despite several requests for what this means, and despite its clear relevance to Prudential's handling of Mr. McGlasson's claim, Prudential has not disclosed relevant documents related to its "flight paths."

82.     Prudential has been determined to deny Mr. McGlasson's claim. It failed to provide Mr. McGlasson with a description of any additional material or information "necessary" to "perfect the claim" and to do so "in a manner calculated to be understood by the claimant." Prudential "hid the ball" from Mr. McGlasson by failing to advise him of what was needed to approve the LTD claim, instead changing its reasons for denial. Initially, it found Mr. McGlasson had no restrictions and limitations; by the Final Denial, it conceded he had medically supported R&Ls but found those R&Ls did not "medically contraindicate" work, which is not even a Plan term.  It relied on evidence that Mr. McGlasson could never address, such as the "neighborhood canvassing" by RCG. It continually added new reasons for denial, in the Final Denial even going as far as to assert new, undisclosed reasons for questioning Mr. McGlasson's credibility.  Even when Mr. McGlasson provided evidence that he had undergone additional cervical spine surgery, Prudential had to acknowledge "multiple surgeries with complications," but this was still not enough. Prudential's adversarial actions precluded Mr. McGlasson from responding to Prudential's rationale for denial at the administrative level.

83.     Prudential wrongfully denied Mr. McGlasson's disability benefits without providing a coherent explanation for its denials, and in a way that conflicts with the plain language of the Plan, violating 29 U.S.C. §§ 1109, 1132.

84.     Prudential did not properly consider all of the available evidence when denying Plaintiff's benefits. In doing so, Prudential failed to conduct a full and fair review. By way of example, it did not have several medical records and diagnostic testing results as part of its original claim file disclosure that it should have requested before terminating the LTD claim.

85.     Prudential blatantly misstated medical evidence for its own financial benefit. It overstated and excessively relied on the surveillance reports, but withheld the surveillance tapes, presumably because they did not support the biased reports and actually corroborated Mr. McGlasson's reported R&Ls. Prudential relied on findings that

OBER & PEKAS, P.L.L.C.
1940 E. Camelback Road, Ste. 150
Phoenix, AZ 85016
(602) 277-1745

constitute "clearly erroneous findings of fact" in making its benefit determinations. By way of example, Dr. Oster's file review is littered with erroneous statements regarding imaging results, at which time Dr. Oster reported the exact opposite findings of several radiological reports and medical records. Prudential then relied on Dr. Oster's erroneous factual findings to deny benefits. The "neighborhood canvassing" was clearly erroneous. Indeed, Prudential abused its discretion by basing its decision on unreliable and inaccurate information in many respects. When confronted with this knowledge, Prudential failed to rectify its inaccuracies.

86.    Prudential tainted it medical file reviewers in the review process by giving the reviewers inaccurate information regarding Mr. McGlasson, while also failing to provide its reviewers with all of the relevant evidence. Prudential provided its reviewers with RCG's biased surveillance reports and "neighborhood canvassing" but not with the actual surveillance tapes. Prudential provided Dr. Oster with internal "SOAP" notes, which skewed Dr. Oster's ability to make an "independent" medical determination and created further bias in his medical review. Likewise, Dr. Ayyar relied upon the surveillance reports, which were biased and riddled with false statements, and not the actual surveillance videos. Prudential never conducted the so-called "de novo clinical review" alleged in its Final Denial.

87.    Prudential provided Dr. Ayyar with Dr. Oster's report and other inaccurate, malicious information involved in the First Denial, which was a procedural violation of ERISA. It did nothing to insulate the appeals reviews from its initial determination and used the same claims managers throughout Mr. McGlasson's administrative appeals process, or at least used employees who were managed by the same person(s) and who were orchestrating the denial according to "flight path 4." *See 29* C.F.R. 2560.503-1(h)(3)(ii), (h)(4) (requires claim fiduciaries to "[p]rovide for a review that does not afford deference to the initial adverse benefit determination and that is conducted by an appropriate named fiduciary of the plan who is neither the individual who made the

adverse benefit determination that is the subject of the appeal, nor the subordinate of such individual.").

88.    Prudential failed to consult with health care professionals who had appropriate training and experience in the field of medicine involved in the medical judgment that was being rendered; namely: Orthopedic Surgery. *See* 29 C.F.R. § 2560.503-1(h)(3), 3(iii). None of Prudential's file reviewers had board certifications in Orthopedic Surgery. By Prudential's admission, it secured multiple reviews from reviewers specializing in Occupational Medicine and Physical Medicine and Rehabilitation but never the one specialty required to properly consider Plaintiff's claim: Orthopedic Surgery.

89.    Prudential routinely emphasized reports that favored a denial of benefits while deemphasizing other reports that suggested a contrary conclusion, especially with regards to its reliance on CEs from the SSA file that Judge Zisook expressly rejected.

90.    Prudential failed to investigate Mr. McGlasson's claim adequately, including its failure to conduct an in-person medical evaluation, which would have been beneficial to a full and fair review of Mr. McGlasson's claim. Prudential had ample opportunity to conduct an IME prior to denial, but it depended instead on unreliable evidence to terminate Mr. McGlasson's LTD benefits, such as double hearsay from neighbors that it refused to identify. It then unreasonably requested an IME on appeal in violation of ERISA.

91.    Prudential has unreasonably withheld relevant documents throughout the entire claim and consistently poorly managed the claim file, which is in part evidenced by its repeated failure to locate documents Plaintiff disclosed on appeal, as well as its recent, 6,000+ page disclosure of Mr. McGlasson's claim file almost entirely comprised of duplicate documents. In its recent, 6,000+ page disclosure, it omitted at least the file review report of the referenced Occupational Medicine physician cited in the Final Denial. Prudential's failure to comply with ERISA's disclosure requirements and poor

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**OBER & PEKAS, P.L.L.C.**
1940 E. Camelback Road, Ste. 150
Phoenix, AZ 85016
(602) 277-1745

management of the file demonstrates its abuse of discretion and improper claims handling.

92.    Prudential failed to properly consider the opinions of Mr. McGlasson's treating and examining physicians. It also failed to reasonably consider Mr. McGlasson's reported symptoms and limitations, and side effects of his medications, in determining whether he was disabled under the Plan. Prudential knew about Mr. McGlasson's worsening issues and additional surgery following his First Appeal but chose to ignore those findings. Indeed, Prudential acted arbitrarily and capriciously when it selectively reviewed Mr. McGlasson's medical records, relying only on those portions of his medical records that supported a denial of benefits.

93.    Prudential unreasonably failed to properly consider Mr. McGlasson's September 6, 2013 fully favorable SSA decision by Judge Zisook and the SSA file. It encouraged Mr. McGlasson to file for SSDI benefits through its preferred vendor and, when the SSA awarded benefits, Prudential failed to address and distinguish its contrary disability decision. The attempt it did make at considering the SSA decision was disingenuous and lacking in any meaningful rationale. Prudential demanded overpayment of SSDI benefits while simultaneously denying Mr. McGlasson's LTD benefits with the knowledge that he was financially drowning and had a family to support, including dependent children. Prudential's failure to properly consider the SSA decision is inexcusable, especially because it had access to Mr. McGlasson's SSA file through the assistance of Allsup, who represented Mr. McGlasson in obtaining his SSDI benefits. Likewise, Prudential provided Allsup with unfettered access to its DCM claims system.

94.    In terminating Mr. McGlasson's LTD benefits, Prudential completely disregarded evidence of Mr. McGlasson's worsening condition. It is uncontroverted – both in Prudential's internal notes and the medical records - that Mr. McGlasson's conditions had not changed or improved.

-23-

OBER & PEKAS, P.L.L.C.
1940 E. Camelback Road, Ste. 150
Phoenix, AZ 85016
(602) 277-1745

95.     Prudential improperly demanded objective medical evidence of Mr. McGlasson's pain and engrafted terms onto the Plan.

96.     On information and belief, the file reviewers and vendors were financially incentivized to deny Mr. McGlasson's claim. MLS Peer Review Services ("MLS") and Nationwide IME ("Nationwide") are biased companies, which frequently provide insurance companies with reviews that are favorable for the denial of claims. Prudential's physician reviewer, Dr. Siva Ayyar, was provided by MLS.  Prudential's physician reviewer, Dr. Claude Oster, was provided by Nationwide. Prudential knew or should have known that MLS and Nationwide are biased companies. As a company-wide practice, Prudential uses MLS and Nationwide, because it knows they provide reviews that are favorable to the denial of claims.

97.     Prudential used MLS and Nationwide in Mr. McGlasson's claim, because it knew that the reviews would be unfavorable for the continuation of his benefits.

98.     Prudential unreasonably failed to ensure that MLS and Nationwide provided unbiased and/or qualified reviewing doctors for purposes of its claims administration.

99.     Dr. Ayyar and Dr. Oster had no reasonable basis for their recommended restrictions and limitations.

100.    On information and belief, Dr. Ayyar and Dr. Oster have been retained by Prudential on numerous occasions to conduct claims reviews or other evaluations.

101.    Both Dr. Ayyar and Dr. Oster have a history of bias against claimants and have been cited in several court cases, which demonstrate the lack of objectivity and reliability of their reports.

102.    The peer reviewers arbitrarily reached their opinions based on insufficient evidence or investigation.

103.    Prudential's physician reviewers never attempted to speak with Mr. McGlasson's treating physicians.

1

2

104.   None of Prudential's reviewing physicians ever set forth any substantive reasons why Mr. McGlasson's doctors' opinions that he could not work were incorrect.

3

4

105.   Prudential failed to explain why it credited the physician reviewers over Mr. McGlasson' treating physicians.

5

6

106.   The peer reviewers were not given the Plan or other important records for reaching its decision that Mr. McGlasson could perform sedentary work.

7

8

107.   The peer reviewers never spoke to Mr. McGlasson, and they never conducted an in-person evaluation of him.

9

10

11

108.   Given Mr. McGlasson's medical conditions and symptoms, there is no way he can perform the material and substantial duties of his regular occupation, or any gainful occupation.

12

109.   Mr. McGlasson has exhausted his administrative remedies.

13

14

15

16

110.   Mr. McGlasson has afforded Prudential every opportunity to act prudently and to fairly consider his claim but instead, Prudential pursued a predetermined flight path to terminate Mr. McGlasson's claim, regardless of the medical evidence provided on appeal.

17

18

19

111.   Prudential is not entitled to an arbitrary and capricious standard of review of their decision in this action, so Mr. McGlasson's claims are entitled to *de novo* review with a bench trial on the record.

20

21

22

23

112.   Pursuant to the coverage provided in the Plan, to ERISA 29 U.S.C. § 1132(a)(1)(B), and to applicable federal and state common law, Mr. McGlasson is entitled to recover all benefits due under the terms of the Plan, and to enforce his rights under the Plan.

24

25

26

27

113.   Mr. McGlasson is entitled to reinstatement of any other employee benefits that were terminated, discontinued, or suspended as a result of the termination of his disability benefits. He is entitled to a restoration of the *status quo ante* before LTD benefits were wrongfully terminated.

28

-25-

OBER & PEKAS, P.L.L.C.
1940 E. Camelback Road, Ste. 150
Phoenix, AZ 85016
(602) 277-1745

OBER & PEKAS, P.L.L.C.
1940 E. Camelback Road, Ste. 150
Phoenix, AZ 85016
(602) 277-1745

114.    Pursuant to 29 U.S.C. § 1132(g), Mr. McGlasson is entitled to recover his attorneys' fees and costs incurred herein from Prudential.

115.    Mr. McGlasson is entitled to prejudgment interest on the benefits to which he is entitled and on his damages at the highest legal rate until paid.

## COUNT II
### (Breach of Fiduciary Duty)
### (Defendant Prudential)

116.    All previous and subsequent paragraphs are incorporated by reference.

117.    Under 29 U.S.C. §§ 1132(a)(2)-(3), this Court may enjoin any act or practice that violates ERISA or the terms of the Plan, as well as grant other appropriate equitable relief, provided that such relief is not recoverable under 29 U.S.C. § 1132(a)(1)(B).

118.    Mr. McGlasson has "other equitable relief" available to him in several forms, including but not limited to surcharge. A surcharge is a kind of equitable monetary remedy against a trustee, which puts the beneficiary in the position he would have attained but for the trustee's breach. Surcharge extends to a breach of trust committed by a fiduciary encompassing any violation of a duty imposed upon that fiduciary. In equity, this Court must make Mr. McGlasson whole following Prudential's breach of trust" and mold the relief to protect the rights of the beneficiary. Therefore, the Court has broad discretion to fashion appropriate relief.

119.    Prudential is a fiduciary and owes fiduciary duties to Plan participants, including Mr. McGlasson. Under 29 U.S.C. § 1104(a), Prudential is required discharge its duties with the care, skill, prudence, and diligence under the circumstances that a prudent man acting in like capacity and familiar with such matters would use under 29 U.S.C. § 1104(a). Under ERISA, which is founded in trust principles, Prudential is required to administer claims in the best interests of beneficiaries and participants as part of its fiduciary duty.

-26-

**OBER & PEKAS, P.L.L.C.**
1940 E. Camelback Road, Ste. 150
Phoenix, AZ 85016
(602) 277-1745

120.    In multiple ways throughout the administration of Plaintiff's claim, Prudential breached its fiduciary duties pursuant to 29 U.S.C. § 1132(a)(2)-(3). Prudential's arbitrary and capricious claims handling generally constitutes a breach of fiduciary duty, because Prudential's claims handling was discharged imprudently and caused Mr. McGlasson harm that cannot be recovered under 29 U.S.C. § 1132(a)(1)(B). Mr. McGlasson filed for bankruptcy due to an inability to pay household and medical bills, which only occurred because of Prudential terminating LTD benefits. Mr. McGlasson had to get roommates and borrow money, including racking up credit card debt, in order to avoid the foreclosure of his family's house, and the financial stress of losing his LTD benefits nearly ended his marriage. Mr. McGlasson now owes significant attorneys' fees because of Prudential's breaching conduct. Prudential arbitrarily and capriciously denied Mr. McGlasson's benefits, which constitutes a breach of fiduciary duty. To the extent that Prudential's arbitrary and capricious denial of benefits caused Mr. McGlasson harm unrecoverable under 29 U.S.C. § 1132(a)(1)(B), that harm is recoverable under 29 U.S.C. §§ 1132(a)(2)-(3).

121.    Prudential and/or RCG, as an agent of Prudential, breached their fiduciary duties to Mr. McGlasson by securing and relying on activities checks that included "neighborhood canvassing." The neighborhood canvassing and activities checks generally caused Mr. McGlasson and his family humiliation and permanently harmed his relationship with his neighbors. There is no record documenting what specific questions were asked as part of the "canvass," how many people were interviewed, or how long the conversations lasted.

122.    Prudential's "activity checks" were intrusive, unnecessary, caused significant embarrassment for Mr. McGlasson, and damaged the relationship he had with his community. Prudential's and RCG's actions were unreasonable, shocking, unfair, malicious, and imprudent. To this day, Mr. McGlasson has not been afforded the opportunity to confront the neighbors who purportedly provided statements regarding his

life and functionality – statements that were considered at every stage of Prudential's appeal review. Prudential's further reliance on that improper information in and of itself constitutes a breach of fiduciary duty. Prudential and its agents should be permanently enjoined from interviewing unidentified neighbors and then using those statements against claimants such as Mr. McGlasson. Prudential's and RCG's conduct caused Mr. McGlasson actual harm, and he is entitled to monetary compensation for that harm. He is further entitled to the removal of RCG as a fiduciary and/or injunctive/mandamus relief preventing Prudential from engaging in "neighborhood canvassing" and similar activities checks with RCG.

123.    Prudential sought "overpayment" of SSDI benefits from Mr. McGlasson immediately following its termination of his LTD benefits and has now sent him to a collections agency since the Final Denial. It pursued collection efforts while administering Mr. McGlasson's claim in its capacity as a fiduciary, despite the obvious conflict resulting from this dual role. While Prudential's overpayment efforts are evidence of its structural conflict of interest as both payer and decision-maker unduly influencing claims decisions, its conduct *also* constitutes a separate breach of fiduciary duty, entitling Plaintiff to surcharge and injunctive relief. Prudential is required to administer claims in the best interests of beneficiaries and participants as part of its fiduciary obligations; but "stand[ing] willing to take appropriate action in order to protect its [overpayment] interest" flies in the face of the actions of a fiduciary charged with fully and fairly reviewing claims. Prudential's actions have caused Mr. McGlasson serious harm. He has been caused significant worry about his credit being further injured by Prudential's recovery efforts and is at collections based on Prudential's letter dated May 1, 2015 once again demanding overpayment. Prudential again began communicating with Mr. McGlasson directly instead of this office through a collections agency, and Mr. McGlasson is now being harassed by creditors.

124.    Prudential should be enjoined from sending participants, including Mr.

-28-

OBER & PEKAS, P.L.L.C.
1940 E. Camelback Road, Ste. 150
Phoenix, AZ 85016
(602) 277-1745

McGlasson, to collections agencies for "overpayment" resulting from SSDI benefits. This is relief unavailable to Prudential under ERISA, and Prudential should be further enjoined from enforcing its purported overpayment rights in light of its malicious conduct. Under ERISA, Prudential can only seek *equitable relief* from Mr. McGlasson. By sending Mr. McGlasson to collections, Prudential has deliberately circumvented the proper channels for relief provided by ERISA. Specifically, Mr. McGlasson's retroactive SSA award does not constitute a "particular fund" that Prudential is entitled to as overpayment *See Bilyeu v. Morgan Stanley Long Term Disability Plan*, 683 F.3d 1083 (9th Cir. 2012).

125.    Prudential's use of Allsup, a company which functions as Prudential's advocate and not participants, is a further breach of fiduciary duty entitling Mr. McGlasson to equitable relief.  Prudential improperly delegating its fiduciary duties to third parties on multiple occasions throughout Plaintiff's claim.

126.    Prudential's structural conflict of interest manifests in the form of "flight paths," but Plaintiff is informed and believes the use of flight paths constitutes a breach of fiduciary duty. Prudential failed to discharge their duties solely in the interest of Mr. McGlasson as a Plan participant by using "flight paths." Plaintiff is informed and believes that "flight paths" resulted from Prudential's company-wide efforts to deny claims based on financial liability instead of merits. As an institution, Prudential uses claim payment reduction goals and cost containment measures as a method of profit-making for the company. In so doing, Prudential unfairly and arbitrarily reduces or denies payments on legitimate claims in an across-the-board fashion to attain its numerical reduction goals. Prudential's cost containment measures are consistent with and a part of a corporate-wide plan and scheme.

127.    Prudential transformed its profitability on its LTD business between 2011-2013 by decreasing the amount of benefits paid out, and also by taking in fewer premiums for LTD contracts. Between 2011-2012, Prudential lost money. Its adjusted operating income *decreased* by $147 million for 2012, in part due to less favorable group disability

-29-

underwriting results, causing new LTD claims to "outpace" claims resolutions. The increase in LTD business "was driven by an increase in the incidence and severity of [LTD] claims and growth in the business," which contributed to Prudential's increased expenses and thus, reported losses for 2012. By 2013, however, Prudential's adjusted operating income *increased* by $141 million. It accomplished this revenue increase not by selling more policies, but instead by decreasing the expenses it paid out, in large part by reducing its claims reserves by $147 million; this happened to be the exact amount of adjusted operating income it had lost the year before. Prudential attributed its reduction in claims reserves to a decline in LTD claims and also to its "enhanced pricing discipline" regarding "group disability business." From 2012 to 2013, Prudential also increased operating costs for the purpose of bolstering its LTD "claims management process." This is significant, because the 2012-2013 savings show "higher claims resolutions and reduced claim incidence for long-term contracts," which would be attributable to increased claims management.

128.    On information and belief, Prudential's efforts to increase profitability following its 2012 losses directly influenced its ongoing handling of Mr. McGlasson's claim. By terminating Mr. McGlasson's claim in 2013, Prudential saved itself significant liability.

129.    On information and belief, Prudential did not have proper safeguards to ensure that its focus on profitability did not affect how its employees handled, evaluated, and assessed claims.

130.    Prudential offers eligible employees participation in the Prudential "Leveraging Opportunities Program Long Term Incentive Award Plan" and, on information and belief, offers other incentive, or "bonus" programs to award employees for their "alignment with the actual savings and operational goals achieved" by Prudential.

OBER & PEKAS, P.L.L.C.
1940 E. Camelback Road, Ste. 150
Phoenix, AZ 85016
(602) 277-1745

131.    On information and belief, Prudential instructs and/or incentivizes certain employee(s) to terminate fully insured LTD claims and appeals, including but not limited to Prudential employees Erin Benjamin, Susan Schultz, James Papi, Kimberly Cyr, and Louisette Hunter.

132.    Mr. McGlasson is informed and believes that Prudential's employees, including but not limited to those mentioned in paragraph 131, are trained in handling "high risk" claims, "flight path" cases, "senior claims review," and in administering claims in the best interests of Prudential, not Plan participants. Mr. McGlasson is informed and believes that Prudential incentivizes its employees to "manage" claims in Prudential's best interests, including but not limited to his claim. Prudential's flight path arrangement is a breach of fiduciary duty requiring appropriate equitable relief following discovery on the meaning of "flight paths" as it relates to Mr. McGlasson's claims handling.

133.    Prudential was unjustly enriched as a result of its breach of fiduciary duty violations, because it wrongfully withheld Mr. McGlasson's benefits for its own profit.

134.    Prudential engaged in several procedural violations in an attempt to circumvent its obligations under ERISA, and these violations are by definition under 29 U.S.C. § 1132(a)(3) conduct that can be enjoined by this Court. For example, Prudential sought an IME on appeal and used the IME as a justification for "tolling" deadlines under ERISA.

135.    The claim file is replete with examples of Prudential acting with malice and in bad faith against Mr. McGlasson, which constitutes a violation of its fiduciary duty.

136.    ERISA "does not elsewhere adequately remedy" the injuries caused to Mr. McGlasson by Prudential's breach of fiduciary duty violations.

137.    As a direct and proximate result of the breaches of fiduciary duty, Mr. McGlasson suffered actual financial harm and incurred financial expense.

OBER & PEKAS, P.L.L.C.
1940 E. Camelback Road, Ste. 150
Phoenix, AZ 85016
(602) 277-1745

138.   Mr. McGlasson is entitled to prejudgment interest on the benefits to which he is entitled and on his damages at the highest legal rate until paid in full.

139.   Pursuant to 29 U.S.C. § 1132(g), Mr. McGlasson is entitled to recover his attorneys' fees and costs incurred herein from JPMorgan and Prudential.

140.   Mr. McGlasson is entitled to enjoin any act or practice by Prudential, which violates ERISA or the Plan, and/or he is entitled to seek other appropriate equitable relief that is traditionally available in equity.

## COUNT II

### (Breach of Fiduciary Duties)

### (Defendant JPMorgan)

141.   All previous and subsequent paragraphs are incorporated by reference.

142.   JPMorgan, as Plan Administrator, is a fiduciary and owes fiduciary duties to Plan participants, including Mr. McGlasson. Under 29 U.S.C. § 1104(a), JPMorgan is required discharge its duties with the care, skill, prudence, and diligence under the circumstances that a prudent man acting in like capacity and familiar with such matters would use under 29 U.S.C. § 1104(a). Under ERISA, which is founded in trust principles, JPMorgan is required to act in the best interests of Plan participants.

143.   JPMorgan offers LTD benefits to employees such as Mr. McGlasson, because it purportedly recognizes how important income replacement can be if an employee becomes seriously ill or injured and cannot work.

144.   JPMorgan fully insures the Plan and has, at various times, used insurance companies besides Prudential. JPMorgan has not to date disclosed the service agreement with Prudential, which is identified in Plan documents and which would outline the fiduciary obligations of each Defendant under the Plan.

145.   JPMorgan acted imprudently by failing to oversee Prudential's claims administration. JPMorgan, as the Plan Administrator, knew or should have known that Prudential handled claims against the best interests of its employees and not pursuant to

OBER & PEKAS, P.L.L.C.
1940 E. Camelback Road, Ste. 150
Phoenix, AZ 85016
(602) 277-1745

the Plan. Mr. McGlasson provided appeals to JPMorgan and notified JPMorgan that Prudential was not providing relevant documents, which is ultimately the Plan Administrator's responsibility.

146.    On information and belief, JPMorgan, as the Plan Administrator, did not periodically review Prudential's actions as a delegated fiduciary under the Plan.

147.    On information and belief, the Plan Administrator's failure to periodically review Prudential's actions as a delegated fiduciary under the Plan was unreasonable and constituted a breach of fiduciary duty.

148.    On information and belief, if the Plan Administrator did periodically review Prudential's actions as a delegated fiduciary under the Plan, then its periodic review was unreasonable and constituted a breach of fiduciary duty.

149.    On information and belief, the Plan Administrator is liable for Prudential's actions, because the Plan Administrator violated its fiduciary obligations by continuing Prudential's delegation as Plan Administrator and/or by failing to protect Plan participants from Prudential's conflicted and adversarial claims handling.

150.    Mr. McGlasson was harmed by JPMorgan's failure to oversee Prudential's conduct. Mr. McGlasson is informed and believes and Prudential has targeted claims under the Plan, including Mr. McGlasson's, and JPMorgan's failure to protect its participants is a breach of fiduciary duty.

151.    Mr. McGlasson is entitled to equitable relief for Defendants' breach of their fiduciary duties, including for the breaches of fiduciary duties committed by any agents or third parties for Defendants.

152.    Pursuant to 29 U.S.C. § 1132(g), Mr. McGlasson is entitled to recover his attorneys' fees and costs incurred herein from JPMorgan and Prudential.

153.    Because JPMorgan breached its fiduciary duties, Mr. McGlasson was actually harmed.

154.    Mr. McGlasson relied on the Plan and JPMorgan to his detriment.

-33-

155.   Mr. McGlasson is entitled to enjoin any act or practice by Defendants, which violates ERISA or the Plan, and/or he is entitled to seek other appropriate equitable relief that is traditionally available in equity.

**WHEREFORE**, on all claims, Mr. McGlasson prays for entry of judgment against Defendants as set forth in this Complaint, which includes:

A.   All past and future LTD benefits under the terms of the Plan;

B.   Clarifying and determining Mr. McGlasson's rights to future benefits under the terms of the Plan;

C.   Any statutory penalties that may be available to Mr. McGlasson as a result of Defendants' violations of ERISA;

D.   All other equitable relief that is proper as a result of Defendants' breach of fiduciary duties;

E.   An award of Mr. McGlasson's attorneys' fees and costs incurred herein;

F.   An award of prejudgment interest on benefits and damages at the highest legal rate until paid; and

G.   For such and further relief as the Court deems just, equitable, and reasonable.

Dated this 5th day of August 2015,

OBER & PEKAS, P.L.L.C.

By: _____
    Erin Rose Ronstadt
    Attorney for Plaintiff

OBER & PEKAS, P.L.L.C.
1940 E. Camelback Road, Ste. 150
Phoenix, AZ 85016
(602) 277-1745

-34-